2000 ME 142

**STATE of Maine**

v.

**John R. MOON.**

Supreme Judicial Court of Maine.

Submitted on Briefs June 27, 2000.

Decided July 21, 2000.

R. Christopher Almy, District Attorney, C. Daniel Wood, Asst. Dist. Atty., Bangor, for State.

Paul A. Weeks, Esq., Norton & Weeks, Bangor, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

WATHEN, C.J.

[¶ 1] Defendant John R. Moon appeals from a judgment entered in the Superior Court (Penobscot County, *Hjelm, J.*) following a jury verdict finding him guilty of theft (Class B), 17–A M.R.S.A. § 353 (1983).[1] Defendant contends that the court erred in limiting his expert's testimony, in instructing the jury concerning the charges of theft by unauthorized taking or transfer and theft by misapplication of property, in instructing the jury concerning the time at which an intention to deprive must exist, and in allowing overly remote evidence of the mental element. Finding no error, we affirm.

[¶ 2] The relevant facts may be summarized as follows: Defendant, while working on his M.B.A. degree at the University of Maine at Orono, was recruited to be a resident advisor of the Sigma Chi Fraternity house. After the local chapter of the Sigma Chi was closed, he was again recruited by alumni of the Rho Rho Chapter of Sigma Chi to resurrect the chapter at the University. He was hired as director of the fundraising campaign, project manager of the renovation project, and live-in resident advisor. He also served, without compensation, as treasurer of the Rho Rho Chapter. During the period defendant was treasurer, he transferred funds from the fraternity's bank accounts on numerous occasions to either himself personally or to Marsh Island Development Company (MIDCO), a corporation in which he was a significant shareholder. He used the funds primarily to renovate a four-story brick townhouse located at 137 Main Street, Bangor, with the intention of then obtaining conventional residential financing. In the end, he was unable to obtain residential financing. He concealed these transfers from the Board of Trustees of the fraternity and obtained no authorization from the Board. During the period defendant was taking the funds, his personal bank balances were low and he incurred substantial debt, the proceeds of which he used in part to repay the fraternity. Defendant continued to take funds even when he knew that obtaining the residential financing would be difficult. He admits that from 1991 to 1994 he took approximately $120,000.00, returned over $100,000.00, and still owes $19,972.41.

[¶ 3] His defense at trial focused on demonstrating that he had no intent to deprive. He argued that he always intended to repay the money and that he believed he had $110,000.00 in equity in his Main Street property to cover the money he had taken. To support his defense, defendant testified himself as to his intent and also introduced the testimony of Gregory Noonan, a certified fraud examiner, certified public accountant and attorney. Noonan testified before the jury as follows: Defendant kept a separate account entitled "accounts receivable-other" in the journal and properly recorded each transaction in which defendant either took funds from the fraternity or returned funds. It was significant that defendant included no other receivables within the "accounts receiv-

---

1. The statute provides as follows:
   1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.
   2. As used in this section, "exercises unauthorized control" includes but is not necessarily limited to conduct heretofore defined or known as common law larceny by trespassory taking, larceny by conversion, larceny by bailee and embezzlement.
   17–A M.R.S.A. § 353 (1983). "Intent to deprive" is defined by statute as follows:
   "Intent to deprive" means to have the conscious object:

   A. To withhold property permanently or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or the use and benefit thereof, would be lost; or
   B. To restore the property only upon payment of a reward or other compensation; or
   C. To use or dispose of the property under circumstances that make it unlikely that the owner will recover it or that manifest an indifference as to whether the owner will recover it.
   17–A M.R.S.A. § 352(3) (1983).

able-other" account, in accordance with generally accepted accounting principles, and important that he included none of these transfers in the general accounts receivable account, which would have been improper because he was an employee. As a result, according to Noonan, defendant left a very good audit trail so that it was easy for an auditor to trace the transactions back to the check register and determine that the funds were made payable to John Moon or MIDCO. Noonan's review of the records confirmed that during the period from 1991 to 1994 the total amount that went to defendant was $123,477.86 and the amount repaid by defendant was approximately $103,505.00, leaving a balance of approximately $19,000.00.

[¶ 4] Defendant was indicted in 1997 for theft by unauthorized taking or transfer in violation of 17–A M.R.S.A. § 353 (1983) and subsequently indicted for theft by misapplication of property in violation of 17–A M.R.S.A. § 358 (1983).[2] In a trial on the consolidated counts, defendant was found guilty of theft in violation of 17–A M.R.S.A. § 353 and now appeals.

### I.   Exclusion of Expert Testimony

[¶ 5] Despite the fact that Noonan testified at length, defendant now argues that the court erred by refusing to let him introduce the expert testimony of Noonan that would explain to the lay person how the financial records were kept, how the records created an audit trail, and how the audit trail was inconsistent with all methods of obscuring theft in the books of a business. In fact, the court excluded only the last element of Noonan's testimony. In *voir dire*, Noonan testified that there are four basic "embezzlement schemes," i.e.,

lapping a/k/a kiting, fictitious receivables, diverting payments in old written off receivables, and borrowing against receivables; that in fourteen years of experience he has not seen a situation of account receivable or cash fraud that fell outside of these four categories; and this case is distinguished because "every transaction was documented right to the T."

[¶ 6] The court refused to allow this portion of Noonan's testimony on the basis of relevancy under M.R. Evid. 401 and 402 and jury confusion under M.R. Evid. 403. The court determined that the expert's testimony dealt with embezzlement schemes, that defendant was charged with theft, and that embezzlement and theft are not necessarily co-extensive. It further found that the testimony could confuse the jurors because Noonan's audit standards for the embezzlement schemes differ from the statutory elements of theft.

[¶ 7] We review evidentiary rulings on relevancy and prejudicial effect for clear error or an abuse of discretion. *See State v. Shuman,* 622 A.2d 716, 718 (Me. 1993). "[W]e accord wide discretion to the court's determination on the relevancy of the proffered evidence, as well as to its evaluation of any unfair prejudice that may result from the admission of the evidence." *Id.* (citations omitted). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401. Even if the proffered evidence on *voir dire* might have helped the jury understand that defendant's conduct was different than the normal conduct of one who takes money in an embezzlement scheme, it was not relevant because it did not make the

---

2.   The statute provides in pertinent part as follows:

   1.   A person is guilty of theft if he obtains property from anyone or personal services from an employee upon agreement, or subject to a known legal obligation, to make a specified payment or other disposition to a 3rd person or to a fund administered by

himself, whether from that property or its proceeds or from his own property to be reserved in an equivalent or agreed amount, if he intentionally or recklessly fails to make the required payment or disposition and deals with the property obtained or withheld as his own.

17–A M.R.S.A. § 358 (1983).

determination of a fact of consequence more or less probable.

[¶ 8] The jury had the expert's testimony, without the proffered portion, that explained how the financial records were kept and how the records created an audit trail. This evidence, without the proffered evidence, supported defendant's argument that because of his meticulous recordkeeping and because he returned a substantial portion of the funds, he did not intend to deprive the fraternity of the funds permanently, but instead intended to repay the debt. Moreover, whether defendant's conduct conforms with historical patterns of embezzlement is irrelevant to whether defendant committed theft by unauthorized taking or by misapplication of funds as defined by the statute. The court correctly found that the embezzlement schemes to which the expert would have testified and the crime of theft as defined by the statute are not co-extensive.

[¶ 9] Expert testimony may be relevant when it is offered to show that the defendant's conduct conformed with a criminal technique. *See State v. Gervais*, 394 A.2d 1183, 1187–88 (Me.1978) (allowing admission of expert testimony that "directions" technique was a commonly recognized method of operation used by burglars to help the jury appreciate the relationship between seemingly innocent acts); *United States v. Brawner*, 173 F.3d 966, 970–71 (6th Cir.1999) (allowing admission of expert testimony concerning telemarketing schemes to help the jury decide whether the defendant's operations were fraudulent). The opposite could be relevant, but in this context the issue is more problematic. Simply because a person is clever enough to devise a new method of committing a theft that does not conform with a known existing embezzlement scheme, or foolhardy enough to document his activity, does not make it less probable that the crime of theft was committed. Although defendant and his expert witness focused on his intent to repay the money to support his contention that he

did not intend to deprive the fraternity of the funds permanently, *see* 17–A M.R.S.A. § 352(3)(A), they ignored the patent possibility that he committed theft in violation of the statute by using the fraternity's money "under circumstances that make it unlikely that the owner will recover it." 17–A M.R.S.A. § 352(3)(C). Accordingly, the expert's testimony concerning embezzlement schemes is not relevant and does not tend to prove that defendant lacked the intent to deprive based on the complete statutory definition of theft.

## II. Jury Instructions

[¶ 10] We review jury instructions "to ensure that they correctly informed the jury of the governing law." *State v. Tarmey*, 2000 ME 23, ¶ 9, 755 A.2d 482 (citation omitted). A court is not required to give instructions in the same language as requested, provided the court's instructions are complete and accurate. *See State v. Carvelle*, 290 A.2d 190, 193 (Me.1972).

[¶ 11] Defendant argues that the court erred in consolidating the two indictments for theft, theft by unauthorized taking, 17–A M.R.S.A. § 353, and theft by misapplication, 17–A M.R.S.A. § 358, before the verdict because it confused the jury. He argues that he submitted two proposed instructions that treated the two indictments separately, but that the court did not use his instructions and instead improperly combined the indictments. He argues that because the two crimes of theft require proof of different elements, by mixing the two in its jury instructions, the court invited the jurors to mix the elements so that the verdict does not necessarily mean that they found all the elements of one offense in order to reach their verdict.

[¶ 12] Reviewed as a whole, the jury instructions were both complete and accurate and not confusing to the jury. At the beginning of the trial, the court instructed the jury as follows: "I do want to

alert you at this point that those charges will be consolidated for your purposes of deliberation; in other words, when you deliberate and reach a verdict, you will be reaching one verdict, whether it's guilty or not guilty, rather than two separate verdicts on two separate charges." In its jury instructions at the end of the trial, the court separately described the elements of theft by unauthorized taking and the elements of theft by misapplication and defined the meaning of the various terms therein. The court explained that the jury could find defendant guilty if the jury found that the State had proven beyond a reasonable doubt that the defendant committed the crime of theft, either theft by unauthorized taking or transfer or theft by misapplication of property. Therefore, the jury instructions relating to the two alternatives for finding theft were not erroneous.

[¶ 13] Defendant also argues that the court erred because it refused to provide his proposed jury instructions which emphasized that the necessary mental element of intent to deprive must exist "at the time of the taking." Defendant's proposed instruction stated in relevant part:

> This intent to deprive the true owner of the property must have existed at the time that the unauthorized control first took place.... [I]f you find that the Defendant exercised unauthorized control over the fraternity's money, you must then examine the evidence whether, at the time Defendant began exercising unauthorized control, he then and there had the intent to deprive the fraternity of that money.

The court instructed the jury as follows:

> A person commits the crime of theft ... if that person obtains or exercises unauthorized control over the property of another with the intent, at the time he obtains or exercises unauthorized control over the property, to deprive the owner thereof.

The difference between the instructions is that defendant sought to limit the criminal act to a single point in time, namely, "the time Defendant *began exercising* unauthorized control," for the purpose of determining the presence of the required mental element. The distinction, however, if any, is not relevant in this case. Even if defendant intended to repay the funds at the precise moment he took them, he nonetheless consciously used the money in a way which the jury could find made it unlikely that the fraternity would recover it, in violation of section 352(3)(C).

### III. Remote Evidence

[¶ 14] Defendant also argues that the court erred in allowing evidence that he filed bankruptcy years after he took the funds and that he had not repaid the fraternity up until the time of the trial. He argues that the evidence was too remote and thus prejudicial because the intent to deprive must be at the time of initially obtaining possession or control. This argument also focuses on his intent to repay the money at the time of the taking and thus lacks merit because it does not negate the particular variant of intent to deprive involved in this case. In any event, the jury could have inferred that defendant had not repaid the fraternity based on his testimony on direct examination that he owes the fraternity $19,972.41.

The entry is:

Judgment affirmed.